Thank you, Your Honor. May it please the Court. My name is Scott Ballinger. I'm the Director of the Appellate Litigation Clinic at the University of Virginia School of Law. And it's my pleasure to introduce Mr. Ignacio Martinez and Ms. Hannah Comeau who will be presenting argument for Mr. Firewalker-Fields. Mr. Martinez will handle the opening argument and Ms. Comeau any rebuttal. Thank you. Thank you. We'll hear from the Cavaliers now. Mr. Castellano. First, it granted prematurely before appellant had an opportunity to seek discovery and after placing the Court on notice that discovery was necessary. This Court recently made it clear in Pledger that it is an abuse of discretion to grant summary judgment in these circumstances. And, Your Honors, we think that the briefing on appeal has made it clear that there are many important unanswered questions that could not have been answered without that discovery. Second, in applying Turner to the Free Exercise Clause claim, the District Court failed to consider easy and obvious alternatives that a trier of fact could have seen immediately indicate that the jail's policies are unreasonable and exaggerated. And third, the District Court applied the wrong standard to the Establishment Clause claim. It applied Turner and thus collapsed the Establishment Clause into the Free Exercise Clause, rendering one of them redundant in the prison context. That's something that no Court of Appeals has endorsed and the Supreme Court gave us the right test in Cutter v. Wilkinson. Your Honors, starting with the first error, the discovery issue, this Court recently held in Pledger that it is an abuse of discretion to grant summary judgment before discovery, even in the context of a pro se litigant who never formally requested it. Fireworker Fields. Mr. Martinez, let me ask you a question and I compliment you on your ability to appear before the Fourth Circuit. When I was in law school, I was scared to appear before my professors, so I want to compliment you and the people who have been able to bring you to this point. Let me ask you a question, sir. I know that you rely on the Pledger case as to the context of when summary judgment should be granted. But isn't it true that in this case, that many of the discovery issues that are presented can at least somewhat be attributed to discovery violations on behalf of your client? We don't think so, Your Honor, because the district court set a 75-day mediation schedule after which the defendants were directed to immediately file for summary judgment. And we think that it was perfectly reasonable for Fireworker Fields to assume that discovery could not have happened during that mediation schedule. And the discovery that he requested was the positions, and as an incarcerated prisoner, he was not allowed to seek that discovery without leave of the court. So we think that as the court found in Pledger, the plaintiff in that case was not at fault in not being able to gather the necessary evidence. Fireworker Fields, similarly, was not at fault. And we also think that Fireworker Fields gave the court appropriate notice. He requested that discovery. And if he had gotten it, the record would look very different. We would have real factual testing of assertions by defendants that on their face just don't make a lot of sense. For example, how can it be impossible for the jail to supervise a group Friday prayer when at the same time they assert that they would have been more than happy to supervise individual visitation between an imam and Fireworker Fields and presumably the rest of the Muslim inmates if only they had been able to find one? Or how can it be that in 2021 where these services— Let's just take that example, right? I mean, I've got a little trouble with the—you know, he seeks on the free exercise claim communal Friday prayer. And yet we know that he cannot have a group meeting, right, because of his—could not. I should speak in the past tense because he's not there, but he could not because of his security classification. And I don't take him to challenge his security classification, nor I suspect would he be very successful in doing so. But so how can he really complain about the communal aspect, right? We have a case called Wright v. Lassiter that suggests that if you're seeking a communal but you can't be in a community, then you have not stated a free exercise claim. What am I missing, at least on this piece of your free exercise claim? Maybe there's a different piece. Yes, Your Honor. So he does have access to the day rooms. That's where the Christian services are being provided. So that communal aspect can be satisfied with something similar. Group Friday prayer on Fridays in the day rooms where the communal aspect, the congressional prayer aspect can be satisfied. All right. So good. So that's one step. So not sort of a private group like we've talked about with some of the other groups. But he says, OK, well, I can do it just like the Christians are doing it. The problem there is that the prison has said we only do that with donated videos. Right. And, you know, that seems like a reasonable position given the sort of play in the joints between free exercise and establishment. Having officers be the ones that are choosing what Muslim videos or prayer services to play doesn't seem like a grand idea. And yet we know from the record that no prayer services were provided. Yes, Your Honor. And that's exactly one of the policies that we're challenging is too narrow under the free exercise clause because we believe that. You're challenging the decision of the prison to not create its own prayer services, to rely on outside groups? No, Your Honor. Just the narrow issue that they will only accept services donated by a local group, because we think that a prior effect would be very entitled to find that these services can be downloaded or live streamed from the Internet. They're not saying a local group. Right. They're saying we don't want we can't choose them. It has to be an outside group that's choosing them. Right. Because, you know, they're in this like tough spot right between free exercise on one side, but establishment calls on the other. And so if the warden is there and he's like, oh, this is the message I want to send the Muslim prayer message, I'm going to choose this Muslim message, not that Muslim message. We might start to think that that looks a lot like endorsement. Right. So the warden is the one making decisions about what prayers or verses of the Koran or whatever it might be is being offered. And that that strikes me as and I think you would agree sort of broadly problematic, maybe not unconstitutional, but problematic at least. And so is your position that the prison cannot make that decision? So they can't say, no, we're not going to be the ones picking the prayer services. We're not going to flip through the Bible and find the Bible verses on which, you know, the video is going to be about. The guards aren't going to make the videos. Right. We think that would be completely fine, especially because of that space in between the joints of both clauses, because context matters in the establishment clause issues. And I think defendants made that point in their briefs as well. And if the prison was to the jail was to offer a Muslim service on top of the Christian service, then both the coercion and neutrality concerns would be alleviated because the whole context would be that the jail starts accommodating more than one religion. So even if I understand that, but they're there, what my point is, is a causation problem. Right. So they they've they've said we only do that if they're outside groups that give us these videos. No outside group gave a Muslim video. Ergo, their action did not cause a free exercise problem. Right. That's right. Versus Lassiter. Right. So that's the rub I'm getting at now. If there was a video that had been submitted and they chose not to play it during these 82 days. Right. We might be in a different spot. But but that's not where we are. Right. I think. Well, your honor, these services are available online and they have been uploaded and donated by Moss. Let me let me ask. Let me reframe it to make sure because you you're just trying to avoid the question reasonably. So I don't mean that as a critique, but the point of that being is that your position is that that they should be required to choose the prayer services, that the warden should be required to go online and pick and choose among prayer services. That's right. They can either pick one of those or let the Muslim in. They speak within both of those are suitable. That undermine the whole policy of exercising your faith. Not all Muslims come from the same perspective. And so if you have one group of Muslims, I think in this case, they're Sunnis who have a different point of view philosophically, spiritually from another group, then the other group is going to complain that this is an imposition of Sunni principles and not the principles we want to live to. And so then we run into the problem that I think Judge Richardson is trying to articulate. Isn't it up to the individual prisoner to identify the means and circumstances as to how his faith is to be communicated in a prison setting? That's certainly correct, your honor. But I think at the baseline of what the free exercise clause requires and similarly to how the Christian inmates get a Mennonite service. In this case, we can have, you know, one Muslim service for Muslim inmates. And yes, in that case, you could run into the potential of some inmates not completely identifying with that service. That's right. And next, moving up. Well, lastly, your honors, we think that firework fields did place a court of notice by requesting discovery. There was no real reason for the district court to deny that motion to seek discovery. And so it was abuse of discretion under pleasure to grant the summary judgment before that discovery could take place. Would any of the discovery requested have gone to the issue that I'm concerned about? Right. The idea that it is a reasonable decision to require outside groups accept that as a hypothetical and that no Muslim groups submitted videos. And therefore, whatever harm came to your client by lacking videos was not caused by the jail or prison, whichever one it is. We think so, your honor, because in his motion to take the positions, he the first three people he listed are Sussex one officials, the Virginia Department of Correction officials. And we think that the only reason why he would have wanted to talk to those people is because Sussex one did accommodate his Friday group prayer requirements. So we think that the whole purpose to seek the positions of those people was to explore alternatives on how a jail could accommodate this requirement. But counsel, we're not really talking about a circumstance where there's not some reasonable effort being made by the prison to address your client's concern. From what I understand, he's got dietary considerations that have been taken into consideration. He has a prayer rug, which I understand is part of their faith component. And they've done other things to allow him to exercise, for lack of a better way of putting it, his religious principles. So this is not a case where someone is necessarily being denied his ability to exercise his religion, is it? We think it is because the congressional prayer requirement is crucial to his faith. And he made that clear in document three of the docket entries that failure to comply with that congressional prayer requirement can rise to the level of him being considered a non-Muslim. So we think that that group prayer requirement is a crucial ingredient that is missing in this case. All right, so why isn't, you know, you'll agree, I assume, under Taylor, etc., that they don't have to do everything somebody asks. And they give him an option to have a Friday prayer with Iman, right, who visits him. And it's a group because there are two of them. I assume that's a group. And that's a manner of doing it, right? It's not the one he wants, right? He wants to do in person, but he can't do that because he's in max security. Maybe he wants to do it on video, but he can't do that because nobody satisfied the requirement of submitting videos. So why isn't that the reasonable accommodation of his free exercise to allow him to have Friday services, a Friday prayer with Iman who visits him? But which he did not, you know, he didn't put anybody on the list. So it's hard to say that, you know, the jail caused that problem either. It's because the challenge under Turner is to the reasonableness of the policies. And under Turner, we think that the fact that there are easy and obvious alternatives, such as, for example, that there could be an exception for him to lead a group service. This court in the Jehovah case made it clear that exceptions to blanket rules can be easy and obvious alternatives. It isn't clear from the record that taking a look at his ability to actually lead a prayer service is antithetical to the prison policy because in certain circumstances you have individuals and gangs and the like who are using those kinds of contexts to do things that are not consistent with religious principles. That's right, Your Honor. That is their legitimate, assertive concern. But what we're missing here is the reasonable relation between that concern and the policy that they have. Because in the Jehovah case, this court said that an exception to the blanket rule in that case, the ban on alcoholic beverages consumption, an exception to that rule for just a religious purpose could be an easy and obvious alternative that could comply with not being in conflict with their assertive concern. Similarly here, we see no reason why a narrow exception just for the purpose of a Friday congressional prayer could not be afforded to him, especially. He made it clear that he was qualified to lead those services. Can I jump over a little bit because your time's running out and sorry we've taken it up. But if hypothesized that I'm looking at Lemon for your establishment clause case and I'm looking at the first step of Lemon, which is, you know, whether it's a religious purpose. Why won't we, why shouldn't we say that the purpose of playing the Christian video is not a religious one, but is instead a compliance with constitutional principles purpose? And I take that from Cutter and maybe also from Taylor. Why is that not the right way to think about step one of Taylor, excuse me, of Lemon under the principles that Cutter announces? So, you know, the jail has asserted that it is that the policy was done pursuant to the free exercise clause. But we think that in this context, because they have refused constantly to accommodate any other religion, that a trial effect will be entitled to find that that purpose is not really what it seems. And so the question there is there's no allegation that any other group submitted a video. Right. I mean, this goes back to the to the question. I understand you think the warden ought to get to go pick which videos to play. But, you know, assume hypothetically that it's a reasonable decision to say we need an outside group to pick them so that we walk this line between free exercise and establishment. If no group has submitted a video, can we say that that the decision that there has been a decision by the jail or that its policy is what caused that imposition? We think we could still say that because, yes, certainly there's a lot of interplay between the free exercise clause and the establishment clause. But the analysis still remains separate. So even if hypothetically the policy is found reasonable under Turner, I think we could still make the argument that the purpose behind the Christian services policy is nefarious. And lastly, Your Honor, just a really quick point. We think Cutter applies because what the question that the court answered in Cutter was what does that space in between the joints of the free exercise clause and the establishment clause look like? That is a question that the court answered in Cutter. And appropriately, it's focused on the core establishment court concerns, which are neutrality and non-coercion. So that is why we think Cutter should apply. And under Cutter, we think that he has presented a triable claim because in this case, there is no— Can I ask one follow-up to that? I'm sorry, Chief. Am I understanding you to say that you think Cutter supplants and or overrules Lemon? Or are you saying that we should apply the Lemon factors in light of Cutter? I think that in this case, in these particular circumstances, because that is what we're looking at. It's state action that goes beyond what the free exercise clause merely requires. And what we're alleging is that it makes that jump in between those joints and then starts encroaching into establishment clause territory.  So we do think that Cutter would supply or override Lemon and Lee in this case. And just provide independently the test that the court should be applying. Thank you. All right. Thank you. We'll certainly welcome any more questions, Your Honors. But if there are none, we would like to reserve the rest of our time.  Thank you very much. Mr. Haw. Thank you, Your Honors. And may it please the court, my name is Julian Harf. I'm here on behalf of Middle River Regional Jail Authority and the superintendent of the jail, Jack Lee. Your Honors, our positions at the district court properly granted summary judgment to the jail and the superintendent. I want to jump right in here, Your Honors. There was a lot of discussion about the fourth factor of the Turner test as it applies to the free exercise clause. That being whether there are obvious or easy alternatives to the current religious programming that's offered in jail. Your Honors, as an initial matter, Firewalker Fields asked for one specific thing from the jail. He asked for an inmate-led service. This idea now that discovery would somehow change that is simply incorrect. What Firewalker Fields wanted discovery for was to develop evidence about whether he had a sincere religious belief as to his Muslim tenants. The discovery had nothing to do with figuring out potential alternatives to the current services that are being offered at the jail. Now on top of that, even if we did go back and get discovery now, he's no longer at the jail. We are now in litigation. What he was required to do was to give the jail an opportunity to address the alternatives that he provided. So even if we went back and now in litigation did discovery about those alternatives, that wouldn't solve the key issue that he did not take his proposed alternatives to the jail. The only alternative he took to the jail was a potential for an inmate-led service, which, as we stated on brief, was not feasible due to the policies that – the security issues and that we don't let inmates lead services. We don't let inmates lead any activities for that matter for security purposes, and all of our activities, secular and non-secular, are provided – I'm sorry. Wait. Can you back up one second? Yes, Your Honor. The last – I just missed it because I was thinking about something else. Did you say you allow no inmate-led services? Yes, Your Honor. It's provided even handily across all secular and non-secular activities. We do not provide any inmate-led activities, whether that be religious or non-religious. Now, the reason behind the fact that discovery wouldn't help Firewalker Fields in this matter is that the burden was on him to present these alternatives to the jail. That is what was developed in Turner. What the Supreme Court said in Turner is that it rejected the notion that prison officials have to manufacture and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. And Your Honor's hit on it. The basis for that is that prison officials, particularly here where we have a local jail in Stanton, Virginia, they are not equipped to make determinations as to what is the best way for a Muslim inmate or an inmate of any minority religion to be celebrating that religion, to be worshiping that religion. They simply don't know, and frankly, some individuals among the same faith worship differently. So it makes sense that the burden is on the prisoner to come forward with those proposed alternatives. Here, Firewalker Fields came forward with one. It clearly wasn't feasible. It was not in line with jail policies, and therefore, we didn't do it. Yeah, but the alternative is a little more granular than that because you're saying, for example, you put forward that part of your restraints are economics, correct? Yes, Your Honor. Well, wouldn't you need discovery to say, well, how much money are you spending on this? You claim that it would be a burden, but I want to know how much do you spend on this? And in this record here, it looks like little or nothing, correct? That's correct, Your Honor. So that's why we have everybody coming in on a volunteer basis is to preserve money. Okay, all right. Now, am I right the time span is about an hour and a half? I believe it's 30 minutes for this particular. No, no, no, no, no. This time span for this period where you have this time where they have in the work area. Yes, Your Honor. I believe that lockdown period is about an hour and a half. About an hour and a half. So then, and you say about 30 minutes is what you have for the non-denominational Christian service, correct? Yes, Your Honor. What I understand in this is that, well, there are videos that are available, obviously led by the appropriate official in terms of the Muslim faith or Islamic faith, right? And for example, why couldn't you play both, both during that hour and a half period? So at a base level. Because you only have one mom to understand that. So, but so you have half an hour, this service, the next half an hour, their service. Yes, Your Honor. And so at a base level, we can't do that because we've had no one volunteer to give us that service. So we have reached out. No, no, no, no, no. That's what the beauty of the Internet. You search it and you find it. This is, for example, in COVID environment, you can search a lot of church services around the country now and say, I like to hear what the Baptist Church in Los Angeles is doing. And you can hear that sermon. OK, for example, or you might hear a synagogue service or a temple service. The point is, why is it you can search it and say, oh, here's one right here. That's the very communal prayer that that he's talking about. Let's play that. You're only playing one. So you wouldn't bother. That's only one person listening to it, right? Your Honor, so I think that makes an assumption, a couple of assumptions. One, that is, we have the capability to do it. So as I think you alluded to earlier, we have a closed circuit TV system. Frankly, because that alternative was never put forward by Firewalker Fields, there was no evidence in the record as to whether that's a feasible alternative. But it's put forward automatically by your response to his act, to his litigation. Well, we only have one monitor. Nobody's come forward. We searched the local area. You can't use it as a sword and a shield. I'm out here doing it, but yeah, but I can't go to the Internet. Why couldn't you? Well, your Honor, I don't think we're saying we can't go to the Internet. I think what we're saying is, as we currently have it, it's provided by a DVD. The Mennonite service is provided by DVD. It's played in a closed circuit TV system throughout the jail. You're making my point now, right. It's a DVD, and that's the old way. The new one is streaming. Stream, you know, that's new. Y'all still use DVD? No, I'm sorry, I'm sorry. But you can stream these things now. So I think what that gets to is, okay, so how are we going to stream it? I don't deny at all, and I think it would be foolish for me to say we can't stream it. We could find the stream, but then the question is, how do we implement it? Okay, so right now, our system does not allow us to stream something from the Internet into the closed circuit television. So then you're talking about purchasing a device for these inmates to use. A laptop? Potentially. Potentially a laptop. Potentially a tablet. But then you run into questions of administration, your Honor. So we don't allow, of course, unfiltered access to the Internet in this jail. We're in prison. It's not unfiltered. You will be the person totally in control of what goes on that monitor. Only you. There's nothing that inmate can put on that screen other than what you allow it to be streamed to. And what he's saying is that you have an hour and a half period of time. You've got an hour left. Anybody who doesn't want to hear that service, they can, like you tell him, go back to your cell. That's what you tell him, right? Am I right? Yes, Your Honor. Well, wouldn't the same thing be told to everybody else? If you don't want to hear this one, go back to your cell. So I think that's assuming we can do the streaming service on the current system we have, and I don't think that's possible. What's the second assumption? You said there are multiple assumptions. Yes, Your Honor. Assumption one is capacity or capability. Yes, Your Honor. What's number two? So the second assumption is that then every other religious group in the jail isn't going to make the same determination. We can only have one case at a time. I mean, for example, when cases that came before that people talk about saluting a flag, and we didn't say whether or not because it was done by another one Christian sect, that, well, somebody else might want that. We take these cases because we don't give advisory opinions, Article III. What's before us is what's before us. It's his case. Now, there are implications of opposite policy in looking at it, but that would be, you can't raise that red herring. You could do that in everything. Your Honor, so the case law does say that we are not required to provide equal accommodations across the board without any consideration as to inmate demand or resources. What we are required to do is to provide reasonable accommodations. So with the alternatives that we've provided, with his ability to have an imam come pray with him, with his ability to have a prayer rug in his cell, with his ability to have a Quran in his cell, with the ability to have the diet that he wants, with the ability to have the Ramadan meals that he wants, we believe we have provided reasonable accommodations. Now, I do think there is precedent to say that that ripple effect I was talking about is legitimate. There have been cases that have said that alone, for example, was one of them. But isn't bottom line from your perspective that the relief specifically and particularly that this individual has requested is not something that's available to any inmate? He wants to lead his own services. That's what he wants to do. And are you suggesting to this court that that accommodation of his religious request is inconsistent with penal policy, the policy of your particular institution, and it's consistently applied to anyone and everyone who makes that particular request? Now, there may be subsets of what could happen. And maybe if in the context of his complaint he had asked for those things, we would have a different case. But he has asked specifically to be allowed to lead his own services. Is that correct? That's exactly correct, Your Honor. What he has asked to do, the only thing that he requested on the record was an inmate-led service. And we cannot do that for the reasons we've discussed. So would we have a different case if in the context of the disposition of this case he had, say, amended his complaint or amended his request and say something that is less arduous, for lack of a better way of putting it, where he's saying what I would like is I would like for this imam who I've identified to be able to come to the jail on certain dates and be able to share with me and anyone else who might request. Would that be something that you would be required to accommodate? So I think that's a closer question. I think right now he can get a form of that by having the imam come for himself. I do think – so the ripple effect that I was discussing earlier, I think there is going to be a question of that. Right now we're talking in hypotheticals depending on exactly what he asked for. But your bottom line is the nature of his broad request in the context of this case is what is fatal to his case. Yes, Your Honor. That's exactly my position. And as you hinted at, there might be certain modifications that could work. I think we've already provided them. But there is a consideration of resources and demand that we have to take into account because otherwise then you're getting an inevitable situation that we would not be able to accommodate. And then you're favoring some groups over others, and that, of course, is going to lead you in your constitution. Let me ask you a final question and then I'll shut up. What if in the context of this case if he had been allowed to pursue his discovery without the confusion of whether the mediation trumped it or whatever, if he had the opportunity to pursue his discovery, he might have come to the conclusion that a more or less arduous accommodation would be something more appropriate and would lead to the resolution of the case? Your Honor, that is not what's in the record. So his discovery, what he asked for, had nothing to do with reasonable alternatives. It had to do with another question, which is, is his belief actually real? You know, does he have a true belief, a Muslim belief? And I doubt to you, but as an officer of the court, you're saying there was nothing in the discovery that talked about reasonable accommodations? From my understanding, no, Your Honor. Okay. No. All right. Thank you. Your Honors, I do want to move on to the establishment clause portion of this argument. If there are no further questions, of course, we would ask that you affirm the ruling of the District Court on the pre-exercise claim that the jail was entitled to summary judgment. Now, of course, we would ask the same, that you affirm the granting of summary judgment on the plaintiff's establishment clause claim. And it's our position that the court properly applied Turner when deciding whether the jail's policy of broadcasting a Mennonite service and not having a Muslim service violated the establishment clause. Now, if you look at the Supreme Court case law, Shaw v. Murphy, for example, the Supreme Court has expressly held Turner provides the test for evaluating prisoners' First Amendment challenges. You then have Johnson v. California saying that Turner applies to all constitutional claims by prisoners involving rights that must necessarily be compromised for the sake of proper prison administration. So this is not a free exercise test. This is a test that applies to all constitutional rights in the prison setting unless it is something that can be compatible with the prison setting. And it's very clearly seen when you talk about something like the Eighth Amendment, right? So in the Eighth Amendment context, you cannot have an officer in a jail that beats someone up for no reason. That's going to apply whether inside or outside prison walls. However, when you're in prison walls, you cannot practice your religion whenever and however you want because you're inside a prison. There are restrictions upon you. So this is exactly the type of case where Turner should apply. Now... But that's where accommodation has to occur. You don't have carte blanche to do anything that you want to do in the exercise of religion, but it has been recognized through precedence of this court and the Supreme Court that the institution must make a reasonable accommodation to your religion because everyone has that right to exercise their point of view spiritually. Yes, Your Honor. And that's exactly what we're saying. We are saying that Turner applies to this case in that we must provide reasonable accommodations for individuals incarcerated to practice their religion. And it's our position that what we have provided Firewalker Fields is reasonable. So can I ask maybe a satiric question? So I've learned to understand your point that Turner applies in the Establishment Clause context the same way it does in the free exercise. Maybe not the same way, but it certainly applies. Is that affected at all by Cutter? Because Cutter, you might read Cutter and its application to this sort of play in the joints between the Establishment Clause and free exercise clause as sort of being the same idea or at least a version of the idea of Turner, right? That they're in effect the same principles, different words, but the same basic principles that they're trying to allow this play in the joints. Is that a reasonable way to read Cutter as sort of not supplanting either Lemon or Turner, but instead helping us understand how to apply the precepts of Turner in the Lemon context? Yes, Your Honor. I think that's exactly how you should read Cutter. So when you just read Cutter, when you read the case itself, it is not clear that Cutter is trying to derive a new test. Just the language of the case does not, you know, there's nothing like, okay, here's factor one, factor two, factor three.  It's very clear that Turner was trying to establish this test, okay? What Cutter addressed was whether a general act of legislation, RLUIPA, was constitutional. That's the confines of Cutter. We have a more narrow case in Turner that specifically looks at what we're looking at right here, which is what is the constitutionality of a specific prison policy as applied to this prisoner? That's what Turner looks at, specific policies within prisons. And that's why Turner applies in this case. Now, to your point, Your Honor. And is that, should I take that to mean, sorry, you come back to your point. Do I take that to mean that the point in part of Cutter, as I think about Lemon and Turner, is that accommodating the free exercise of detainees is not a religious purpose for Lemon ideas, right? That, in fact, it's a constitutional purpose. It's compliance with constitutional dictates. That's sort of what Cutter seems to suggest to me in that context. That's a statute. This is a policy. But the principle would seem to be the same, that complying with their constitutional obligations to permit the free exercise does not, at least in many circumstances, thereby create an establishment clause problem. That's right, Your Honor. So what we are required to do by the free exercise clause in prison is accommodate the free exercise of religion. So that's exactly what we're doing here. That's the secular purpose. The purpose of what we've done is to accommodate, in this case, the largest faith group at the jail, but we've also accommodated everybody at the jail. So the purpose here is not to endorse Christianity. The purpose is to do what we're required to do, which is to provide the exercise of religion. And I want to point out a specific portion of Cutter that essentially gets to what you're talking about, Your Honor, which is that Cutter does not supplant Turner but can be read in conjunction. And these other establishment clause tests, particularly Lee and Lemon, can be read in conjunction with Turner, similar to the current qualified immunity standards where you first determine, well, you can determine in either order, but is there a constitutional violation? And if so, was the law clearly established? So here, Turner, of course, is not a establishment clause test. It is a test looking at specific prison policies and whether they are reasonable. So you can do an establishment clause analysis and also do a Turner analysis. Those two things can be read in conjunction, and I want to point you to a specific part of Cutter that goes towards this. So the court said in Cutter, We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain order, security, and discipline, and consistent with consideration of costs and limited resources. That right there, Your Honors, is exactly what Turner talks about. It's talking about keeping in mind resources and the specific context that the jail is in when promulgating these policies. I got one final question since you're out of time, if the Chief will allow it. So I'm still worried a little bit about this interplay, right? And so I know this is not the case. This is a hypothetical question, right? So accept that as a given. Would the analysis be different under the Establishment Clause here if the warden was the person who was picking the videos? So if the warden was saying, you know, I'm really, you know, I'm a fan of this particular Christian message, and so I'm going to pick, you know, services that talk about redemption, right? Because the Christian ideals of redemption are ones that I want to promote. And so the warden is the one making those choices. Would that affect us as we start thinking about either the Cutter-Turner limit analysis? How does that play in? Yes, Your Honor. So I think that is closer to endorsing a religion, right? Because then you have a warden who is specifically saying, I want this type of service. So here, so instead of accommodating the reality that we need to promote, we need to provide free exercise of religion, he is now reaching out based on content and saying, I want this. Rather than in this specific scenario, where all we do is we have volunteers come in and provide what they can, we're not making any determination as to what's better or worse or what we want and don't want. So the safe harbor is to do nothing and let the prisoner take control of what types of services he or she wants and allow the prison officials to decide whether it's consistent with the policies of the institution under all the circumstances presented. Yes, Your Honor. And to take into account the resources, the jail, the population, the demand, and things like that. Yes, Your Honor. And with that, if there are no further questions, we would ask that you affirm the decision of the district court. Just one thing before you go. Yes, Your Honor. Much has been made of and rightfully so, your side, that he did not articulate what alternatives he had or wanted. Correct? Yes, Your Honor. But I can maybe understand the merits of that or the strength of that, I should say, as to the free exercise. But is that really dispositive as to establishment? Don't you have a responsibility to, whether color applies or not, in engaging in establishment? Because the theory is you are given license to do more as a government to establish something because that's the only way you can do that for people who are wards of the state or the government to have free exercise. So you're given a pass, if you will. Turner seems to suggest you say it better. But in doing that, don't you have to look at neutrality and lack of compulsion? So, therefore, whether he puts forward those alternatives or not in the framework of establishment, that's at issue, isn't it? Because the question is, for example, you say, well, we couldn't find Iman. Well, maybe you only looked at the city limits. And maybe it requires you to go, but you could find many Christian churches within a stone's throw of the institution. But wouldn't that, in terms of neutrality, require you to have a larger net to establish neutrality? Because, oh, well, you know what? I searched all just in town limits, and I couldn't find any. End of search. Wouldn't that be sort of facetious? If you know, in terms of the demographics that you're in, that you have to go to the next major town? Your Honor, I think so what we have to do is what's reasonable.  These are inmates in prison. There's simply not going to be as many opportunities as there would be, say, in D.C. or even Richmond to get that type of service. So what we cannot do is coerce somebody to engage in a service that they don't want to engage in. We cannot coerce them to become part of, you know, to watch the service. We didn't do that, okay? And I agree with you. We absolutely have to maintain neutrality. But our ultimate requirement is to provide reasonable accommodations for people to accomplish their religious exercise. And with what we've done in this case at this jail, we believe we've accomplished that goal. And absolutely, I agree with you. We must maintain neutrality, and I think we've done that here, Your Honor. So I just want to make sure I understand your answer to the question because I thought it was a good one. If – what is a reasonable response from the jail might well depend on the circumstances, right? And so if you – I'm not sure it's true here, but, you know, if you went out and sought donations from the Mennonites, my guess is they just came to you. But if you went out and sought them from the Mennonites, then you would have to do a reasonably comparable effort, and that might be broader or might be narrower depending on what the religious group was. You're not disagreeing with that idea, that if you're doing a search for religious groups, that the nature of that search might depend on the nature of the religious group? No, I don't disagree with that at all, Your Honor. Your point is here, you don't have to do a search at all, right? That's not – the premise here is that you're not required to go out and find religious speakers or provisions. So long as what we're doing is providing – for inmates to accomplish their free exercise rights, absolutely, Your Honor. And again, Your Honor, we ask that you would affirm the decision of the district court in granting summary judgment to the jail. Thank you. All right, thank you, Mr. Hart. Ms. – is that pronounced come-you? Come-you? Come-you? You'll tell us. Thank you, Your Honors. Just a few brief points in response today. First, Firewalker Fields – Counsel, can you – for me, at least, because I'm a little challenged, can you pronounce your name so I won't mispronounce it if I ask a question? Sure, it's Comeau. Comeau. Okay, thank you. Thank you. Thank you. First, Firewalker Fields would have been content, and this shows in the record, with alternatives such as video or livestream services. You'll see in the joint appendix at pages 8, 9, 11, 13, 18, and 19 that Firewalker Fields requested that Jumu'ah services are put in place at the facility, and no case doesn't mention in-person services. And while it might be true that he may have preferred an in-person service to an alternative video streaming of such services, the declaration of a preferred alternative does not automatically waive any other alternative to no services whatsoever. Counsel, how do you deal with your opponent colleague's point that in the complaint itself and the relief that your client is seeking, he has articulated a particularized basis for how he wants to exercise his religion, and the bottom line is that that is not an option that's available, and he has not pled any alternative basis for being able to exercise his faith. Right, Your Honor. Again, I emphasize that the declaration of one particular favorable way in which to practice these services does not waive any other potential alternatives. And in addition to that, as my colleague has said in our primary argument, if he had been granted discovery in this case, which he should have been, we would have likely had those alternatives been made a little bit more clear. And in this case, that isn't even all that necessary. For instance, the facility already plays Mennonite services over the closed-circuit TVs. We know for a fact that they have these readily available. And second, the inmate handbook, which is publicly available online, indicates that there are tablets available for inmate use. If that's indeed the case, why didn't your client plead the same circumstances that the Mennonite services provided? Your Honor, again, this schedule, our pro se litigant here was met with an aggressive mediation schedule, followed immediately by briefing. He's a maximum security inmate and did not have the necessary means to do so. And so under pledger, he did what he was supposed to to actually put the court on notice that he was supposed to be able to get that discovery. The problem you've got is sort of a twofold one. I just want to make sure I understand the argument. One is the allegation, and that's what Judge Alston is talking about. Even if we get past that, the challenge you've got is that for in-person prayer services or for video, you've got nobody that's offering to do them or provide them. And so you don't have a causation problem, right? So it's not the jail that's preventing him from having group services. It's the failure of someone to volunteer combined with his maximum security status. So to take that as an example, even if he alleged that as an alternative, it's not caused by the jail's limitation, but instead by his security status and the lack of a volunteer. Your Honor, this policy is, it actually, we argue that it is not reasonably related to the penological interests at stake here. And, you know, in addition to that, I, sorry, one more time. I want to be able to answer your question appropriately. Right, so I'm just, what I'm trying to understand is, so if I take away the pleading problem of what the relief is, but then I say, take for example, that he wants the video. I'll use that as an example. The problem we have is that the jail only allows donated videos, right? And there's no donated video here. And so that's a causation problem, even if that was part of his allegations, I guess. And to get through both of those hurdles is where I'm having trouble. Yeah, no, thank you, Your Honor, for the clarification. I want to stress here that there are actually alternatives available to this very strict policy that's in place. So, for instance, I understand that there's a concern with staff picking the services, for instance. And we understand that. But they at least could have presented the inmates with options here and let him choose. And then, you know, that's an alternative here that doesn't run afoul of the Establishment Clause as well. So the idea is the warden picks the three that he likes the best, and that's not an Establishment Clause concern because the ultimate choice is made by the inmate. Ultimately, Your Honor, our position is that in the context of a maximum security prison, the inmate is not going to be able to feasibly choose these without any aid from an outside source. And so in that context, then, yes. And I'll let you go. I'm sorry. But that's sort of the point, right? And that's why the warden says we need an outside source to do this. Like, I don't want to be involved in it because I don't want to endorse religion. You can't be involved with it for, I think, obvious reasons. So that's why we rely on an outside source to provide them. And the Mennonites do it for this religious group or some portion of that religious group. And if we got one, you know, we'd have a different case if there was a video that was submitted for the Muslim faith and it wasn't played, right? I mean, it's correct that while it would be nice if an Islamic, outside Islamic faith group donated a video here, because they are a minority religion, that's not as likely going to happen as for Christian services. And so, Your Honor, all we're doing here is presenting alternatives that are feasible under the circumstances. Thank you very much. Appreciate you. Yeah. And if there's no other questions. I just want to be very clear. When you said that alternatives were presented, that's in the context of the pellet process. When were they presented? Apologies. In the joint appendix? Yeah, the site. I mean, the site. Yeah, yeah. So on page... And who were they given to? Because much has been said that he never suggested anything other than a communal prayer. But you said it's not the case, right? Right. And in all of his complaints, for instance, throughout the joint appendix, again, these are on pages. And I can turn to the pages and read the language. No, no, no. What I'm saying is you said he did it before litigation or during litigation? I believe before litigation. Before litigation. Yeah. Right. Yeah. All right. Thank you so much. Counsel, thank you all. And Professor, thank you so much. Mr. Martinez and Ms. Comeau. Thank you so much. You've acquitted yourself well as cavaliers. Thank you so much. And we appreciate your helping the court on these cases. You're court assigned. And as Judge Alston said, you're far ahead of me in terms of doing law school days and being an appellate fourth circuit court. That's impressive. And you've performed and done very well. Mr. Hoff, of course, you're able representation as well as the regional jail. Thank you so much for being here. We can't come down and shake your hand, but know that we appreciate you very much and we wish you well. Be safe and take care. Thank you so much. Thank you. Thank you. Thank you.
judges: Roger L. Gregory, Julius N. Richardson, Rossie David Alston Jr.